UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

MINNESOTA LABORERS HEALTH AND WELFARE FUND; MINNESOTA LABORERS PENSION FUND; MINNESOTA LABORERS VACATION FUND; CONSTRUCTION LABORERS' EDUCATION AND TRAINING FUND OF MINNESOTA AND NORTH DAKOTA; MINNESOTA LABORERS EMPLOYERS COOPERATION AND EDUCATION TRUST,

Civil File No. 00-2784 DSD/SRN

Plaintiffs,

vs.

**ORDER**

RR MILLER ENTERPRISES, INC., d/b/a EXCEL ENVIRONMENTAL,

Defendant.

This matter came before the undersigned, United States Magistrate Judge Susan Richard Nelson, on April 11, 2002, upon agreement of the parties for a determination of amounts due from the Defendant to the Plaintiffs for the year 2001. Pamela Hodges Nissen and Andrew J. Shea, McGrann Shea Anderson Carnival Straughn & Lamb, Chartered, represented the Plaintiffs. James P. Mulvahill, Mulvahill Law Firm, represented the Defendant. The parties agreed that this Court's Order is final and binding upon them. Based upon the testimony, evidence, and record before the Court, it hereby makes the following:

## FINDINGS OF FACT

1. Prior to the hearing, the parties stipulated to certain facts, and provided the Court with a fully executed Stipulation of Facts, with Exhibits A through C. A copy of that

FILED APR 19 2002
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD________
DEPUTY CLERK________

Stipulation, along with its attached Exhibits A through C, is attached to this Order and incorporated by reference herein.

2. Expert testimony was provided by Mr. William Grimm regarding the scope of the Collective Bargaining Agreement and an employer's liability for fringe benefit contributions. Mr. Grimm, an expert in the industry, has been actively representing asbestos abatement and environmental contracting employers, in the collective bargaining negotiation process for more than 10 years. Mr. Grimm negotiated the specific Collective Bargaining Agreement, stipulated to by the parties as covering this dispute.

3. As testified to by Mr. Grimm, the parties to the Collective Bargaining Agreement use the term "employee" throughout the Agreement, and do so without attaching any statutory meaning to the term. Rather, the term "employee" refers to the common law definition of that term.

4. As also testified to by Mr. Grimm, fringe benefit contributions are due for employees without regard to whether such individuals are members of the Laborers' Union.

5. Based upon the stipulated facts, and agreement by the parties, the following amounts are due from the Defendant to the Plaintiffs for fringe benefit contributions for the year 2001 for the following individuals:

| Employee | Hours | Rate | Total Due |
|---|---|---|---|
| Basulto, Tony | 101.5 | $7.22 | $732.83 |
| Cespedes, Roger | 10 | $7.22 | $72.20 |
| Flores, Henry | 7 | $7.22 | $50.54 |
| Garcia, Harold | 26 | $7.22 | $187.72 |
| Guerra, Sixto | 177 | $7.22 | $1,277.94 |
| Guzman, Juan | 151.5 | $7.22 | $1,093.83 |
| Jarrett, Norman | 7 | $7.22 | $50.54 |
| Moreno, Gustavo | 12.5 | $7.22 | $90.25 |
| Moreno, Javier | 43 | $7.22 | $310.46 |
| Pena, Jose | 330.5 | $7.22 | $2,386.21 |
| Perez, Jorge | 16 | $7.22 | $115.52 |
| Sanchez, Fernando | 101.5 | $7.22 | $732.83 |
| Villanueva, Roland | 43 | $7.22 | $310.46 |
| Webb, Roy | 12 | $7.22 | $86.64 |

6. The parties further stipulated that Laurie Collins worked a total of 598 during 2001. Because she did not appear to provide testimony, the parties agreed, and the Court finds that 100% of all of her hours were spent performing work within the jurisdiction of the Collective Bargaining Agreement.

7. The parties stipulated that Anthony Monack worked a total of 823 hours during 2001 and that Dave Vasquez worked a total of 575 hours during 2001.

8. Based upon the testimony provided by Mr. Monack and Mr. Vasquez, 100% of their hours were spent performing work within the jurisdiction of the Collective Bargaining Agreement.

9. The following amounts are due from the Defendant to the Plaintiffs for fringe benefit contributions for the year 2001 for Ms. Collins, Mr. Monack, and Mr. Vasquez:

| Employee | Hours | Rate | Total |
|---|---|---|---|
| Collins, Laurie | 598 | $7.22 | $4,317.56 |
| Monack, Anthony | 823 | $7.22 | $5,942.06 |
| Vasquez, Dave | 575 | $7.22 | $4,151.50 |

10. Mr. Nathan Aamot worked a total of 845 hours for Defendant during 2001. Mr. Darren Aamot testified that N. Aamot spent 20% of his time performing work within the jurisdiction of the Collective Bargaining Agreement. Defendant produced a partial set of daily Sign-In forms, which confirmed at least a portion of that time was spent at the various job sites. The Court finds that the Plaintiffs are entitled to the greater of either the hours reflected with the partial set of daily Sign-In forms provided by Defendant, or as testified to by Mr. Darren Aamot, 20% of the total hours worked by Mr. Nathan Aamot. Based upon the submissions of Plaintiffs' counsel, the hours reflected on the partial set of Sign-In forms total 69 hours. Twenty percent of Mr. Nathan Aamot's total hours worked, is 169 hours.

11. Therefore, the Court finds that the greater of the two is Mr. Darren Aamot's testimony of 20% of the total hours worked, or 169 hours. A total of $1,220.18 is due from

the Defendant to the Plaintiffs for fringe benefit contributions for 2001 for Mr. Nathan Aamot.

12. Mr. Darren Aamot spent a total of 139 hours signed into the various projects. Based upon Mr. Darren Aamot's testimony, the Court finds that he spent an additional 25 hours working on those projects as set forth in Plaintiffs' Exhibit 5, and an additional 25 hours performing glove bag jobs. Therefore, Mr. Darren Aamot spent a total of 189 hours performing work within the jurisdiction of the Collective Bargaining Agreement.

13. A total of $1,364.58 is due from the Defendant to the Plaintiffs for fringe benefit contributions for 2001 for Mr. Darren Aamot.

14. The total amount of delinquent contributions for 2001 is $24,493.85.

15. Liquidated damages, as provided under the Agreement, total 10% of the delinquent contributions or $2,449.39.

16. Plaintiffs have incurred $4,207.50 in fees and $270.69 in costs in preparation for the April 11, 2002 hearing.

17. The parties stipulated that to date, Defendant has paid the Plaintiffs a total of $1,911.65 for fringe benefit contributions for 2001.

18. The Defendant has deposited $14,702.94 with this Court.

**CONCLUSIONS OF LAW**

1. All individuals employed by the Defendant during 2001, performing the type of labor as defined under Article 4 of the Collective Bargaining Agreement (Ex. B to the Stipulation of Facts), are covered employees within the scope of the Agreement. The term

"employee" as used in the Collective Bargaining Agreement means that as defined under common law.

2. Employees who are performing the type of labor as defined under Article 4, are covered by the Agreement without regard to whether they are "supervisors" or whether they are members of the Laborers' Union.

3. Defendant is liable to the Plaintiffs for amounts due for fringe benefit contributions for all hours its employees worked performing labor within the jurisdiction of the Collective Bargaining Agreement. Defendant is entitled to a credit in the amount of $1,911.65 for the payments made, and has already deposited $14,702.94 with the Court.

4. Defendant's total liability for fringe benefit contributions is $24,493.85. Of that amount, Defendant has paid directly to the Plaintiffs the sum of $1,911.65 and has paid to the Court the sum of $14,702.94. Therefore, the balance remaining due and unpaid for fringe benefit contributions for the period of January 1, 2001 through December 31, 2001 is $7,879.26.

5. Per the terms of the Collective Bargaining Agreement, and under ERISA § 502(g)(2), 29 U.S.C. § 1132(g)(2), the Defendant is liable for an additional 10% of all delinquent contributions as liquidated damages, and is further liable for Plaintiffs' reasonable fees and costs incurred in the prosecution of their claims.

NOW THEREFORE, IT IS HEREBY ORDERED THAT:

**ORDER**

1. No later than ten (10) days from the date of this Order, Defendant shall pay to the Court the balance of the unpaid fringe benefit contributions past due for the period

of January 1, 2001 through December 31, 2001 totaling $7,879.26 plus attorney fees of $4,207.50 and costs of $270.69;

2. Upon receipt of that payment, the Court shall remit to the Plaintiffs the total amount on deposit with the Court, $27,060.39;

3. In the event Defendant fails to remit to the Court the payment set forth in paragraph 1 above, within ten (10) days, this Court will promptly enter judgment against Defendant, and in favor of the Plaintiffs in the amount of $12,357.45. The Court shall then promptly remit to the Plaintiffs the amounts on deposit, $14,702.94.

Dated: April 19, 2002

Susan Richard Nelson
United States Magistrate Judge

UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

MINNESOTA LABORERS HEALTH AND WELFARE FUND; MINNESOTA LABORERS PENSION FUND; MINNESOTA LABORERS VACATION FUND; CONSTRUCTION LABORERS' EDUCATION AND TRAINING FUND OF MINNESOTA AND NORTH DAKOTA; MINNESOTA LABORERS EMPLOYERS COOPERATION AND EDUCATION TRUST,

Plaintiffs,

vs.

RR MILLER ENTERPRISES, INC., d/b/a EXCEL ENVIRONMENTAL,

Defendant.

Civil File No. 00-2784 DSD/SRN

**STIPULATION OF FACTS**

The parties to the above-captioned matter, by and through their counsel, hereby stipulate to the following:

1. Attached hereto as Exhibit A is a table summarizing the number of hours individuals worked for the Defendant during the year 2001. The parties do not stipulate as to whether the number of hours worked by the individuals represent "covered work" as defined under the Collective Bargaining Agreement.

2. Darren Aamot was throughout 2001, a salaried employee, receiving a set weekly salary amount.

3. The appropriate contribution rate for fringe benefit contributions to the Plaintiff Funds for the period of January 1, 2001 through December 31, 2001 is $7.22 per hour.

4. Attached hereto as Exhibit B is a true and correct copy of the Collective Bargaining Agreement governing this dispute.

5. Set forth below is the rate of pay for certain employees and date of hire:

| Employee | Rate of Pay | Date of Hire |
|---|---|---|
| Dave Vasquez | $25.00/hour | (unknown) |
| Roland Villanueva | $21.00/hour | March 2000 |
| Anthony Monack | $27.00/hour | June 1997 |
| Henry Flores | $20.90/hour | December 2001 |
| Nathan Aamot | $27.00/hour | May 1995 |
| Tony Basulto | $22.50/hour | May 2001 |
| Darren Aamot | $1,346.15/week (salary) | March 1994 |
| Laurie Collins | $23.00/hour | May 1999 |

6. Attached as Exhibit C is a table setting forth the payments made to the Plaintiff Funds by Excel Environmental towards fringe benefit contributions due for the period of January 2001 through December 2001.

7. To date, Excel Environmental has deposited $14,702.94 with this Court.

Date: April 14, 2002.

McGRANN SHEA ANDERSON CARNIVAL
STRAUGHN & LAMB, CHARTERED

By: ______________________________
Pamela Hodges Nissen
Atty. Reg. No. 259810
800 Nicollet Mall, Suite 2600
Minneapolis, MN 55402
Phone: (612)338-2525

*Attorneys for Plaintiffs*

Date: April 14, 2002.

MULVAHILL LAW FIRM

By: ______________________________
James P. Mulvahill
Atty. Reg. No. 151932
701 Fourth Avenue South
Minneapolis, MN 55415
Telephone: (612) 337-9033
*Attorney for Defendant*

# EXHIBIT A

## Stipulation of Facts

Civil File No.: 00-2784 DSD/SRN

MINNESOTA LABORERS FRINGE BENEFIT FUNDS

Excel Environmental

| | Name | S.S. # | Year | Total | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sept | Oct | Nov | Dec |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Aamot, Nathan | 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 | 2001 | 845 | | | | 5 | 40 | 216 | 188 | 127 | 62 | 127 | | 80 |
| 2 | Basulto, Tony | 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 | 2001 | 101.5 | | | | | | 88.5 | 13 | | | | | |
| 3 | Cespedes, Roger | 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 | 2001 | 10 | | | | | | | | | | | | 10 |
| 4 | Collins, Laurie | 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 | 2001 | 598 | | | 7 | | 88 | 153 | 107 | 97 | 76.5 | 69.5 | | |
| 5 | Flores, Henry | 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 | 2001 | 7 | | | | | | | | | | | | 7 |
| 6 | Garcia, Harold | 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 | 2001 | 26 | 26 | | | | | | | | | | | |
| 7 | Guerra, Sixto | 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 | 2001 | 177 | | | 12.5 | | | 135.5 | 13 | | | | | 16 |
| 8 | Guzman, Juan | 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 | 2001 | 151.5 | 8 | | | | | 130.5 | 13 | | | | | |
| 9 | Jarrett, Norman | 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 | 2001 | 7 | | | | | | | | | | | | 7 |
| 10 | Monak, Anthony | 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 | 2001 | 823 | 32.5 | | | 5 | 132 | 205 | 144.5 | 117.5 | 82 | 70.5 | | 34 |
| 11 | Moreno, Gustavo | 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 | 2001 | 12.5 | | | | | 12.5 | | | | | | | |
| 12 | Moreno, Javier | 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 | 2001 | 43 | 20 | | 10.5 | | 12.5 | | | | | | | |
| 13 | Pena, Jose | 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 | 2001 | 330.5 | 38.5 | | | | 74.5 | 204.5 | 13 | | | | | |
| 14 | Perez, Jorge | 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 | 2001 | 16 | | | | | | | | | | | | 16 |
| 15 | Sanchez, Fernando | 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 | 2001 | 101.5 | | | | | | 88.5 | 13 | | | | | |
| 16 | Vasquez, Dave | 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 | 2001 | 575 | | | 7 | 7 | 67 | 168 | 144 | 121 | 61 | | | |
| 17 | Villanueva, Roland | 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 | 2001 | 43 | | | 10 | 7 | 10 | | | | | | | 16 |
| 18 | Webb, Roy | 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 | 2001 | 12 | | | | | | | | | | | | 12 |
| | Totals | | | 3879.5 | 125 | 0 | 47 | 24 | 436.5 | 1389.5 | 648.5 | 462.5 | 281.5 | 267 | 0 | 198 |

Fringe Benefit Contributions Rate: $7.22

# EXHIBIT B

## Stipulation of Facts

Civil File No.: 00-2784 DSD/SRN

**TRADE AGREEMENT**

between

**MINNESOTA ENVIRONMENTAL CONTRACTORS ASSOCIATION**

and

**MINNESOTA LABORERS DISTRICT COUNCIL**
ON BEHALF OF ITS AFFILIATED UNIONS

**January 1, 1999 - December 31, 2001**

THIS AGREEMENT, by and between, or on behalf of the parties and in the capacities and status designated in Article 2, hereof, establishes rates of pay, wages, hours of employment, fringe benefits, and vacation, where applicable and other terms and provisions concerning employment relations and collective bargaining relations and collective bargaining between or involving such parties on construction work in the State of Minnesota, excluding work in the counties of Kittson, Marshall, Polk, Pennington, Red Lake, Norman, Mahnomen, Roseau, Lake of the Woods, Beltrami, Clearwater, Koochiching, Itasca, St. Louis, Carlton, Lake and Cook.

NOW, THEREFORE, for such purposes, it is agreed as follows:

**ARTICLE 1**
Considerations for Agreement

The considerations for this Agreement are the mutual promises of the parties and their mutual purposes to establish, maintain and promote sound and harmonious labor relations.

It is desirable to maintain the cooperative relationships existing during past years between the Employers and the Employees represented by the Union.

**ARTICLE 2**
Designation of Parties

Minnesota Environmental Contractors Association (hereinafter called MECA) and the Minnesota Laborers District Council, on behalf of its affiliated Unions, is a party to this Agreement in a representative capacity, and as agent only, acting on behalf of certain of its members who have agreed to be bound to the terms of this Agreement through MECA.

**ARTICLE 3**
Union Recognition

The Employers hereby recognizes each one of the Unions to which the Contractor has agreed to be bound, as the exclusive collective bargaining representative of the Employees in the craft signatory to this Agreement, in respect to rates of pay, wages, hours of employment, fringe benefits, vacations where applicable, and other conditions of employment. The respective Unions are hereby recognized hereunder by the Employers as the sole and exclusive

bargaining representatives of the Employees represented by them. The respective Unions represent that they are qualified for such recognition.

**ARTICLE 4**
Scope of Work/Subcontracting

1. This Agreement covers the rates, pay, rules and working conditions of all employees engaged in the following work:

(a) Asbestos: Work that is regulated or specified as "asbestos related work" which are tasks in connection with the enclosure, handling, control, removal, encapsulation (but does not include reinsulation of mechanical systems) and disposal of asbestos-containing material and waste related to the work. These work tasks include asbestos abatement area preparation, and the operation of all tools and equipment normally used in the handling, control, or removal of asbestos.

(b) Lead: Work that is regulated or specified as lead abatement work involving commercial, industrial, and residential work (four units or more work with public funding), which are tasks in connection with structures where lead or materials containing lead are present. This includes removal or encapsulation of materials containing lead, lead contamination/emergency cleanup and preparation of area, and the operation of all tools and equipment normally used in the handling, control or removal of lead.

(c) HVAC Cleaning and Decontamination: Work specified to render HVAC components clean, and to verify the cleanliness through inspection and/or testing. This includes the removal of surface contaminants and deposits from within the HVAC system. The HVAC is defined as the heating, air conditioning and ventilation system. This includes the operation of all tools and equipment normally used in the cleaning and decontamination of HVAC systems.

(d) Mold Remediation: Work specified in connection with the enclosure, handling, control, removal, encapsulation and disposal of mold or materials which contain mold. This includes disinfection of structures or surfaces exposed to mold, and application of final coatings. This includes mold remediation area preparation; and the operation of all tools and equipment normally used in the remediation of mold.

2. There will be no subcontracting of work, except to other Employers signatory to this Agreement. The Asbestos and Lead Abatement Contractors signatory to this Agreement agree to make a good faith effort to subcontract the demolition and/or reinsulation work, (if it is within their contract), to a person, firm or corporation party to an appropriate current labor agreement within the appropriate AFL-CIO affiliated union within the jurisdiction of this Agreement. The representative or agent of the Minnesota Asbestos Abatement Contractors' Association will assist in this endeavor, by trying to locate an AFL-CIO affiliated contractor who is competitive with the non-AFL-CIO contractor's bid.

**ARTICLE 5**
Union Security and Checkoff

1. All Employees covered by this Agreement, as a condition of continued employment, shall, commencing on the eighth (8th) day following the beginning of their employment, or the effective date of this Agreement, whichever is the later, acquire and maintain membership in the Union for the duration of their employment. This provision shall not apply where and if such a requirement for continued employment is prohibited by State law; provided, however, that

an Agency Shop is lawful in any such state, conformity therewith shall be a condition of employment on the eighth (8th) day following the beginning of such employment, or the effective date of this Agreement, whichever is the later period.

2. Upon the written request of the Union, the Employer shall be required to terminate the services of any Employee who is in violation of any applicable provision of this Article.

3. The Employer agrees to deduct from the pay of Employees and remit to the appropriate Local Union and/or District Council, all deductions authorized by the Employees, pursuant to a voluntary written authorization provided to the Employer. The authorization is signed by each Employee and is in a form consistent with applicable law.

## ARTICLE 6
### Hiring Employees

The Employers agree to give the Union the first opportunity when hiring new Employees. First opportunity shall be defined to mean that the Employer shall call the Union for not less than the first 50% of his new Employees.

Nothing in the foregoing shall be deemed to require the employers to call only the Union for Employees, or to hire only Employees referred by the Union.

The Employer or his or her supervisor may inform new Employees that the Employer is a Union contractor and as such, Employees on or before the eighth (8th) day of employment shall become and remain a member in good standing as a condition of employment.

There shall be no discrimination against any Employee because of affiliation or non-affiliation with the Union, race, color, age, sex, political or religious beliefs.

When called and the Union fails to provide qualified men or women within twenty-four (24) hours, the Employer shall be free to employ anyone to perform the work at the appropriate scale as contained herein.

## ARTICLE 7
### Payday Wage Payment

1. All regular, full-time Employees covered by this Agreement shall be paid in full each week. Not more than seven (7) days shall be held back, including payday. All hours must be reported by the end of the pay period, and if not, the late reported hours will be reflected in the subsequent paycheck.

2. When an Employee is laid off, or discharged he or she shall receive all money due him or her in negotiable check within twenty-four (24) hours. If the Employee has not collected his or her check, the Employer will immediately mail his or her check to the Employee's last known address. This provision is intended to conform with State Statue #181.13.

3. The Employer agrees to provide the following information on Employee's check stub: hours, date, regular pay, overtime pay, gross pay, deductions, net pay.

4. During the term of a contract, no wage cuts shall be received by an Employee. An Employee shall remain in his or her current wage classification until he or she qualifies for a higher rate.

5. The first (1st) Employee in the shop shall be at the highest classification rate. For additional Employees, at least one Employee shall be at a higher rate if two (2) Employees are at the lowest rate.

**ARTICLE 8**
Wage Rates
Schedule

1. Hours worked within the removal industry and counted after the later of January 1, 1989 or the date receiving State certification (<u>except as noted below</u>).

**Effective January 1, 1999**

| Hours | Base Wage | Vac | H&W | Pen | LECET | In Fund | Nat'l H&S | TOTAL |
|---|---|---|---|---|---|---|---|---|
| 0-750* | $14.33 | 1.36 | 2.66 | 2.05 | .06 | .40 | .02 | $20.88 |
| Over 750 | 17.03 | 1.36 | 2.66 | 2.05 | .06 | .40 | .02 | 23.58 |

**Effective February 15, 1999**

| Hours | Base Wage | Vac | H&W | Pen | LECET | Ind/Ed Fund | Train | TOTAL |
|---|---|---|---|---|---|---|---|---|
| 0-750* | $15.43 | 1.36 | 2.68 | 2.15 | .05 | .25 | .21 | $22.13 |
| Over 750 | 18.13 | 1.36 | 2.68 | 2.15 | .05 | .25 | .21 | 24.83 |

**Effective January 1, 2000**, there shall be a $1.25 per hour increase, fringes TBA.
**Effective January 1, 2001**, there shall be a $1.20 per hour increase, fringes TBA.

*Employees that have completed the Laborers' Construction Awareness Safety Training Program will advance to the higher rate at 500 hours worked within the removal industry.

Note: The "removal industry" is defined as work for signatory contractors. If an employee works for a non-signatory contractor, he or she will restart at the beginning of the wage scale at zero hours.

On all jobs where four (4) or more men are employed, there shall be a Foreman who shall receive $1.25 above the base rate of pay.

2. Room and Board - There shall be a subsistence zone established for jobs located more than 50 miles from the St. Paul-Mpls city limits, as defined by the intersection of University Avenue and Emerald Street. The Employee will receive subsistence pay at a rate of $35.00 for each working day for jobs located in the subsistence zone <u>and</u> more than 50 miles from the Employee's residence. Subsistence pay covers board, room and travel time, including mileage.

3. When Employees are called to work, they shall receive two hours Show Up Pay. In order to qualify for any pay they must remain on the job for up to two hours if requested by the Employer.

There is no responsibility to pay Show Up Pay if any of the following conditions are applicable:

- Inclement weather;
- The owner shuts down the job for factors beyond the control of the Employer;
- The Employee is late in reporting to the job.

**ARTICLE 9**
Work Weeks and Holidays

1. Forty (40) hours of Employee work shall constitute one (1) work week, between Monday 12:01 A.M. through Sunday 11:59 P.M.

2. (a) All time worked in excess for forty (40) hours shall be paid at a rate of one and one-half (1-1/2) times the Employee's regular straight time hourly rate of pay. (b) All time worked in excess of ten (10) consecutive hours on Davis-Bacon Prevailing Wage Projects shall be paid at a rate of one and one-half (1-1/2) times the Employee's regular straight time hourly rate of pay.

3. An Employee required to work on Sunday will be paid at a rate of one and one-half (1-1/2) time the Employee's regular straight time hourly rate of pay, regardless of whether the employee has reached forty (40) straight time hours. For the purposes of this section, "Sunday" is defined as 12:01 A.M. Sunday to 4:00 A.M. Monday.

4. The following holidays or days celebrated as such: New Years Day, Memorial Day, Independence Day, Labor Day, Thanksgiving Day, and Christmas Day.

5. All time worked on designated holidays shall be paid two (2) times the Employees straight time hourly rate of pay.

6. In cases of layoff caused by lack of work, the Employer shall give written notice to the Union.

**ARTICLE 10**
Insurance and Taxes

A. The Employer agrees to carry any and all insurance and pay all taxes as required by applicable State and Federal law.

B. The Employer further agrees to pay the State Worker's Compensation Insurance and the State Unemployment Compensation fund such amounts as are due, from and after the date Employees of these Unions are employed on the job.

**ARTICLE 11**
Discharge

The Employers may discharge any Employee whose work or behavior is unsatisfactory, or who fails to observe the safety precautions or other reasonable rules and regulations prescribed by the Employers or any governmental agency. No Employee shall be discharged for refusing to work under unsafe conditions.

**ARTICLE 12**
Settlement of Disputes

1. Any controversy over the interpretation of, or adherence to the terms of this Agreement shall first be attempted to be resolved between the Union and the Employer. Any controversy or grievance shall be deemed to be waived, unless submitted in writing within ten (10) working days after the first occurrence of the event or knowledge of the condition giving rise to the grievance.

2. If a satisfactory settlement cannot be reached within five (5) working days, the matter may be brought to the Disputes Board, if both parties agree in writing. In such case, the grieving party shall submit a written statement of the claim the facts of the matter to other parties including the Employer, the Union and the MECA. The rules of the Disputes Board shall be those already adopted by the Joint Committee.)

Both parties must sign the document binding them to a Board decision. If either party does not attend a designated meeting after signing the above and being notified of the meeting date and time, a decision will be rendered though they are not present.

Decision of the Disputes board shall be drafted at the conclusion of the meeting, signed by members of the Board, and distributed to both parties at that time.

3. The Disputes Board is made up of equal numbers of Management and Labor representatives, who shall meet regularly to settle any disputes, (other than jurisdictional disputes) to avoid work stoppages, or other problems affecting productivity. This Board shall have no power to add to, delete, or modify, any of the terms or provisions of this Agreement. All decisions of the Disputes Board shall be final and binding on the parties.

If either party, after signing above documents, refuses to abide by the decision of the Disputes Board, economic action may be taken by the other party.

4. Should the Disputes Board be unable to reach a decision on the matter before it by facing a deadlock (lack of majority), or either party refusing to use the Joint disputes Board, the matter may then be referred to a Board of Arbitration. The Board of Arbitration shall be conducted in the following manner: the Union and the Employer shall ask the Federal Mediation and Conciliation Service for a list of five (5) names from which the aggrieved party shall strike the first two (2) names and the other party shall then strike two (2) names, and the final name shall be selected as the Arbitrator. The Arbitrator thus selected shall set the time and place for hearings which shall begin no later than ten (10) working days after his or her selection, with the final decision to be handed down in not more than ten (10) working days after the last hearing is held. The time may be extended by mutual agreement between the parties.

The decision of the Arbitrators shall be final and binding on signatories to this Agreement who are parties to the dispute; provided, however, that the Arbitrators shall have no power to add to, delete, or modify any provisions of this Agreement.

All work and other conditions prevailing immediately prior to the raising of the question to be decided under this Article shall remain unchanged until final decision has been reached hereunder.

## ARTICLE 13
Management

Management reserves the right to manage its jobs to the best interest of Management; the right to retain or dispense with Employees; to reduce or increase the number of Employees needed on each project, crew, activity or piece of equipment. Under no condition will Union Representatives make demands for more Employees in a crew on specific projects, insofar as it does not conflict with this Agreement.

## ARTICLE 14
Pickets, Banners and Strikes

The Employer shall not require an Employee to go through a primary picket line or banner to work. It shall not be a violation of this Agreement and it shall not be cause for discharge or disciplinary action in the event an Employee decides not to cross a primary picket line or banner. This clause shall not apply to secondary picket lines or banners and it shall not apply to jurisdictional picket lines, banners or watch persons employed by the contractor.

## ARTICLE 15
Strikes, Lockout, Work Interference

The Unions and the Employers agree that there shall be no strikes, lockout, work-stoppages, slow-down, sit-down, stay-in or other concerted interference's with the Employer's business or affairs by any of said Unions and/or the members thereof, and there shall be no lockout during the existence of this Agreement.

Spread-work tactics, slow-down, stand-by crews, forcing of overtime have been and are condemned by both parties, and Employees engaging in same shall be liable for disciplinary action.

## ARTICLE 16
Union Representatives

The Employer agrees that the Union business representative(s) shall be allowed free access to and on any job or project upon which members of the Union, or employees under the jurisdiction of the Union are employed or will be employed; and any Employee shall have a reasonable opportunity to discuss a grievance with the business representative(s) during working time without loss of pay. The Union may designate a steward on projects having over ten Employees. The job steward shall be allowed the same privileges as the business representative(s) on the job on which such steward is assigned job steward duties. Stewards shall not be transferred from one project to another except in cases of mutual agreement between the Employer and Business Manager(s).

## ARTICLE 17
Payroll Records

In case of a dispute arising over hours, wages and fringes, the Union shall have the right to examine the payroll records of the individual Employees covered by this Agreement upon which there is a dispute. Prior to the actual

examination, a written request shall be submitted to the Employer involved.

**ARTICLE 18**
**Tools**

The Employer is entitled to establish a system of signing out for tools or equipment that is the property of the Employer and used by the Employee in his or her course of employment. If the tools are not returned, the Employer is allowed to deduct the cost of the missing item from the wages of the Employee that has signed out for the tool or piece of equipment. The Employer may only deduct an amount representing the reasonable value of the missing item.

**ARTICLE 19**
**Fringe Benefits**

The Employer agrees to contribute every month, not later than the 15th day of the following month (hereinafter called the "due date"), such sums for Pension, Health and Welfare, Vacation, Laborers Employers Cooperation Education Trust (LECET), Industry/Education and Training Funds as may be designated in the wage schedule of this Agreement. The Funds shall be known separately as the Laborers' Pension Fund, the Laborers' Health and Welfare Fund, LECET Fund, Industry/Education Fund, Vacation Fund and Training Fund and collectively as the Minnesota Laborers' Fringe Benefits Fund. Each Fund shall be under separate Trust Agreements, for which the Employer shall receive copies and to which the Employer is automatically bound. The Fund's Trustees shall equally represent the Union and the Employer.

1. Contributions to be paid on one check with all other fringes to an administrative agency with a local office.

2. Contributions paid on an hourly basis on all hours worked and not to be pyramided: Example: if hourly wage is $3.00 plus $.10 fringe, time and one-half overtime rate -- $4.50 plus $.10 fringe and double time overtime rate -- $6.00 plus $.10 fringe. Or shift work, contributions shall be paid on the same proportionate hourly basis as hours worked to hours paid.

3. There shall be no requirement that Employees sent to work outside the scope of this Agreement be paid fringes, nor shall the Employer be required to duplicate fringe contributions.

4. (a) An Employer shall be considered "delinquent" for a particular work month if its required report and payment for that month are not postmarked on or before the 15th day of the following month (the "due date"), irrespective of whether such delinquency is willful or otherwise.

(b) If an Employer becomes delinquent for a particular work month (as provided in (a) above), he shall also be required to pay, as liquidated damages and not as a penalty, an amount equal to 10% of the payment otherwise due for such work month - it being understood and acknowledged by the parties that actual damages are extremely difficult or impossible to ascertain and that the amount so fixed as liquidated damages is reasonable.

(c) If an Employer becomes delinquent for a particular work month (as provided in (a) above), as to any or all of the Trust Funds, and if the report and the full payment due for such work month (including liquidated damages) are not postmarked in the office of the Fund Administrator on or before the 15th day of the month following the applicable due date, such Employer shall

(in addition to paying the full amount due) be required to post in the office of the Fund Administrator a cash or surety bond in form satisfactory to the Trustees and in the face amount of $20,000. This shall cover all of the Trust Funds and assure payment of all sums called for by this Agreement, in the event of the Employer's subsequent delinquency. This sum shall be kept in force and maintained in the full face amount for a period of not less than 12 consecutive calendar months, during which no further delinquency has occurred on the part of such Employer.

The Union shall refuse to supply men and shall prohibit Employees covered by this Agreement from working for any such delinquent Employer who fails or refuses to provide or maintain such a bond.

(d) Illustration of clauses (a), (b), and (c): If an Employer's report and payment for the January work month have not been postmarked before February 16, such Contractor becomes delinquent at that point and must pay the full amount due, plus 10%. If the report and the full payment for January (including the 10% liquidated damages amount) are not postmarked before March 16, the Employer must then post a $20,000 bond in addition to reporting and paying the full amount due.

(e) The delinquent Employer shall also be required to pay all costs of collection actually incurred by the Trust Funds, including all attorney fees, service fees, filing fees, court reporter fees, and all other fees, costs and disbursements incurred by or on behalf of the Trust Funds in collecting the amount due. Trustees at their discretion, may reimburse (from the fund) the Unions for picketing and bannering expenses actually incurred by trying to collect amounts due the Trust funds. The Unions expenses shall be deemed to be costs of collection incurred on behalf of the Trust Funds.

(f) Each Employer who is required to make payments to the Trust Funds shall promptly furnish to the Trustees, or the Unions, or their authorized agents, on demand, all necessary employment and payroll records relating to its Employees covered by this Agreement. This includes any other relevant information that may be required in connection with the administration of the Trust Funds. The Trustees, the Unions, or their authorized agents may examine such employment, or payroll records whenever deemed necessary, to ensure the proper administration of the Trust Funds.

If any Employer fails or refuses to furnish its payroll records to the Trustees, the Unions, or their authorized agents upon demand or refuses to afford the above reasonable opportunity to examine the same, in accordance with standard auditing procedures, the Trustees or the Unions may enforce such rights by legal action. In this event, all attorney fees, service fees, filing fees, court reporter fees and other legal costs and disbursements, as well as the auditing fees and costs incurred in conducting such audit, shall be paid by such Employer. The Unions shall also have the right to take economic action to enforce such rights on behalf of the Unions and the Trustees. The Trust Funds shall reimburse the Unions for picketing and bannering expenses actually incurred in enforcing such rights.

(g) Notwithstanding the provisions of Article 11, Settlement if Disputes, the failure, refusal or neglect of an Employer to report and to pay sums due the Trust Funds or otherwise to comply with the terms and provisions of this Article shall not be subject to arbitration.

(h) The parties to this Agreement acknowledge that the provisions of this Agreement establishing rates of pay, wages, all hours of employment and other terms and conditions of employment, including fringe benefits, apply to

Employees employed in job classifications within the jurisdiction of the Unions, regardless of whether or not such Employees are members of the Union.

5. Any and all fringe contribution rates shall be open for adjustment on any anniversary date upon thirty (30) days written notice to MECA. Such adjustment shall operate to adjust wages in a like amount.

6. Every Employer signatory to this Agreement shall be required to post a bond in the minimum amount of $20,000 to insure satisfaction of all financial obligations which may be due the employees for services performed. The Union must obtain evidence of said bond prior to signing an employer and providing workers. MECA may obtain an association-wide bond on behalf of its contractor members. The Employer need only obtain one $20,000 bond to cover all union agreements to which it is signed, but said bond must address the obligation to each union agreement intended to be covered.

7. The Employer agrees to contribute to the Laborers-Employers Cooperation and Education Trust (LECET) Fund and agrees to be bound by the terms of the Trust Agreement, a copy of which may be obtained by the Employer upon request. The Fund's Trustees shall equally represent the Union and the Employer.

## ARTICLE 20
Savings Clause

This Agreement is intended to be in conformity with all applicable and valid State and Federal laws, rules and regulations. Any conflict between the provisions of this Agreement and the terms of any such laws and regulations shall cause the provisions of this Agreement so in conflict to be superseded or annulled but shall not supersede or annul the terms and provisions of this Agreement which are not so in conflict.

## ARTICLE 21
American Disabilities Act

Notwithstanding any of the provisions of the Agreement, the Employer, at its discretion, may take such actions that are necessary to effectuate compliance with The American with Disabilities Act. Such action shall not be a violation of this Agreement, nor shall it be a subject of arbitration. The Employer does not agree, assume, ratify, approve or condone any conduct, act or practice of the funds, trustees, and/or administrators, or their agents, which is in violation of the American with Disabilities Act.

## ARTICLE 22
Joint Labor Management Committee

The parties of this Agreement agree to form a joint labor-management committee, consisting of signatory unions with MECA, for the purpose of promoting harmonious labor-management relations; ensure adequate communications; address safety concerns; seek the enforcement of industry regulations; advance the proficiency of the workers and the industry; and promote the use of union contractors.

## ARTICLE 23
Workers' Compensation Fund

Employers that are eligible may elect to enter a Workers' Compensation Fund that provides workers' compensation benefits and is approved by the Union. This Fund will be in a joint labor management trust and will be funded from contributions from employers.

The operation of the Workers' Compensation program will be determined by the trustees in accordance with the Agreement and Declaration of Trust of the Fund. Those electing to participate in the Program agree to be bound by the Agreement and Declaration of Trust establishing the Fund, together with any amendments thereto and regulations established by the trustees. Those electing to participate in the Program agree to be bound by the delinquency collection procedures established by the trustees of the Fund, as may be revised from time to time.

It is the purpose of this Trust Fund to provide employees who claim compensable personal injuries and occupational diseases occurring under Minnesota Workers' Compensation laws with benefits required by law. The amount of contributions to this Fund shall be established by the trustees and may be changed from time to time.

## ARTICLE 24
Duration

1. Any party shall have the right to terminate or amend this Agreement by giving notice to the other party, sixty (60) days prior to the expiration of this Agreement. Failure to give such notice shall cause this Agreement to be renewed automatically for a further period of twelve (12) months.

2. In the event such written notice is given and a new Agreement is not signed before the expiration date of this Agreement, then this Agreement shall continue in force until a new Agreement is signed, negotiations are formally broken off, or until a strike or lockout occurs.

3. This Agreement shall become effective January 1, 1999 and remain in full force and effect until December 31, 2001.

## ARTICLE 25
Attachments

The signatory Employer can become signatory to the North Dakota Asbestos Abatement Agreement or the Northern Minnesota Asbestos Abatement Agreement by signing Attachment #1 or Attachment #2 respectively.

TRADE AGREEMENT WITH MINNESOTA ENVIRONMENTAL CONTRACTORS ASSOCIATION

Expires December 31, 2001

For: Minnesota Environmental Contractors Association

[signature] Executive Director
Name and Title

For: Laborers' District Council of Minnesota & North Dakota

[signature] PRESIDENT & BUSINESS MGR.
Name and Title

Date: February 1, 1999

TRADE AGREEMENT WITH MINNESOTA ENVIRONMENTAL CONTRACTORS ASSOCIATION

Expires December 31, 2001

For: Minnesota Environmental Contractors Association

______________________________
Name and Title

For: Laborers' District Council of Minnesota & North Dakota

______________________________
Name and Title

Date: ______________________________

**ASBESTOS ABATEMENT**

**ACCEPTANCE OF AGREEMENT**

Date______________________________

The undersigned Employer hereby agrees to abide by the terms and conditions of the Agreement as negotiated by and between the Minnesota Environmental Contractors Association and the Laborers' District Council of Minnesota and North Dakota on behalf of its affiliated Local Unions.

The aforementioned Agreement refers to the previously negotiated Agreements by the parties mentioned covering the period of January 1, 1999 through December 31, 2001. This Agreement will expire on December 31, 2001.

This contract is signed by the Employer or his authorized representative on behalf of the firm and an authorized Local Union representative on behalf of the Laborers' District Council of Minnesota and covers all work covered by said Agreement in the State of Minnesota.

COMPANY______________________________
(please print)

ADDRESS______________________________

CITY, STATE, ZIP______________________________

TELEPHONE______________________________

FAX______________________________

E-Mail______________________________

SIGNATURE______________________________

ATTACHMENT #1 (North Dakota Agreement) SIGNATURE______________________________

ATTACHMENT #2 (Northern Minn. Agreement) SIGNATURE______________________________

TITLE OF SIGNATOR______________________________

LABORERS' DISTRICT COUNCIL OF MINNESOTA & NORTH DAKOTA

BY______________________________

SEE ATTACHMENT #1 AND ATTACHMENT #2

Attachment #1

ASBESTOS ABATEMENT

ACCEPTANCE OF AGREEMENT

Date____________________________________

The undersigned Employer hereby agrees to abide by the terms and conditions of the Agreement as negotiated by and between the Minnesota Environmental Contractors Association and the Laborers' District Council of Minnesota and North Dakota, as amended by this Attachment, on all work covered by said Agreement. This Agreement runs from January 1, 1999 through December 31, 2001. This Agreement will expire on December 31, 2001.

This Attachment of the Agreement establishes rates of pay, wages, hours of employment, fringe benefits for the State of North Dakota.

Effective January 1, 1999: Rate of Pay - 80% of the hourly taxable rate of pay (excluding vacation benefit pay). All fringe benefits are the same as stated in Article 8 of this Agreement.

All other terms and conditions of the Agreement apply.

Receipt of a copy of the standard printed Agreement is hereby acknowledged.

COMPANY_________________________________
(please print)

ADDRESS_________________________________

CITY, STATE, ZIP_________________________

TELEPHONE_______________________________

FAX_____________________________________

E-Mail__________________________________

SIGNATURE_______________________________

TITLE OF SIGNATOR________________________

LABORERS' DISTRICT COUNCIL OF MN & ND

BY_____________________________________

LABORERS' LOCAL 580

BY_____________________________________

Attachment #2

ASBESTOS ABATEMENT

ACCEPTANCE OF AGREEMENT

Date ____________________

The undersigned Employer hereby agrees to abide by the terms and conditions of the Agreement as negotiated by and between the Northern Minnesota Asbestos Abatement Contractors Association and the Laborers' District Council of Minnesota and North Dakota, for Laborers' Locals 1091 and 1097 and its jurisdiction, on all work covered by said Agreement. This Agreement runs from January 1, 1998 through December 31, 2000. This Agreement will expire on December 31, 2000.

This Attachment of the Agreement establishes rates of pay, wages, hours of employment, fringe benefits for the Minnesota counties of Kittson, Marshall, Polk, Pennington, Red Lake, Norman, Mahnomen, Roseau, Lake of the Woods, Beltrami, Clearwater, Koochiching, Itasca, St. Louis, Carlton, Lake and Cook.

Effective January 1, 1999

| Hours | Base Wage | Vac | H&W | Pen | LECET | Train | TOTAL |
|---|---|---|---|---|---|---|---|
| 0-500 | $13.85 | 1.36 | 2.66 | 0 | .06 | .18 | $18.11 |
| Over 500 | 18.20 | 1.36 | 2.66 | 2.50 | .06 | .18 | 24.96 |

Effective January 1, 2000 - 0-500 and Over 500 hours, $.90 total package increase, fringe benefits to be announced.

All other terms and conditions of the Agreement apply.

Receipt of a copy of the standard printed Agreement is hereby acknowledged.

COMPANY ____________________
(please print)

ADDRESS ____________________

CITY, STATE, ZIP ____________________

TELEPHONE ____________________

FAX ____________________

E-Mail ____________________

SIGNATURE ____________________

TITLE OF SIGNATOR ____________________

LABORERS' DISTRICT COUNCIL OF MN & ND

BY ____________________

LABORERS' LOCALS 1091 OR 1097

BY ____________________

# EXHIBIT C

## Stipulation of Facts

Civil File No.: 00-2784 DSD/SRN

## MINNESOTA LABORERS FRINGE BENEFIT FUNDS

Excel Environmental
Payments made to the Funds for contributions for 2001

| Employees | Hours | Rate | Total Paid |
|---|---|---|---|
| Collins, Laurie | 111 | 7.22 | $801.42 |
| Vasquez, Dave | 61 | 7.22 | $440.42 |
| Jarrett, Norman | 7 | 7.19 | $50.33 |
| Guerra, Sixto | 16 | 7.19 | $115.04 |
| Perez, Jorge | 16 | 7.19 | $115.04 |
| Villanueva, Roland | 16 | 7.19 | $115.04 |
| Aamot, Darren | 38 | 7.22 | $274.36 |
| TOTALS | 265 | | $1,911.65 |

83421